Follansbee Estate.

Argued April 29, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Edward R. Lawrence* and *R. A. McCrady,* with them *E. B. Wolfe, McCrady & Nicklas* and *Paul, Lawrence & Wills,* for appellants.

*Sidney J. Watts,* with him *Baker & Watts,* for appellee.

OPINION BY RENO, J., July 17, 1947:

The question to be decided is which one of two claimants is entitled to the commission for selling decedent's

real estate. The auditing judge allowed the claim of John B. Nicklas, Jr., an appellant. Upon exceptions, the court en banc, the auditing judge dissenting, set aside the allowance and sustained the claim of O. R. Minnemeyer, appellee. Nicklas, the executors, and several legatees appealed.

Nicklas is a lawyer, and on October 11, 1944, the day following decedent's funeral, was retained by Anna Dashiell, a legatee, to represent her interest in the estate. He was not employed by the executors in any capacity. Minnemeyer is a licensed real estate broker, and was expressly though verbally employed by the executors to sell the real estate, but his contract did not constitute him an exclusive or sole agent. Both Nicklas and Minnemeyer, independently of each other and apparently without knowledge of the other's actions, offered the property to the Masonic Fund Society which eventually purchased it. Both could not have been the efficient cause of the sale, *Wilson v. Franklin*, 282 Pa. 189, 127 A. 609, and the problem is which one is entitled to the commission of $1075, which admittedly is the proper stipend for the service.

Mrs. Dashiell advised Nicklas when she retained him that Mary L. Boyce, to whom the real estate had been devised for her life upon condition that she maintain it and pay the taxes, had elected to have the property sold under the provisions of the will directing its sale by the executors. Nicklas called William Paul, the attorney for the estate, and asked at what price the property would be sold. Paul suggested $50,000, to which Nicklas demurred, whereupon Paul stated he would have the property appraised and inform Nicklas of its appraised value. During the conversation Nicklas suggested that the Masonic Fund Society, a corporation which holds the legal title to the real estate of the fraternity of which Nicklas is a member, might be interested in purchasing the property, and immediately communicated to Elmer E. Stanier, the secretary of the society, the information

that the property was for sale, and asked him to propose its purchase to the society's board. On December 5, 1944, the society authorized Stanier "to contact the attorney for the estate and to secure from him a price [for the property], it not being the idea to purchase unless a low sale price is quoted." Either immediately before or after the society's action, and the evidence on this point is not altogether clear, Nicklas quoted the price of $25,000 to the society, which figure he had been informed by Paul was its appraised value. There were further conversations between Nicklas and Stanier, in the Spring of 1945, but they did not result in action by the society or the estate.

At this juncture Minnemeyer entered the transaction. Whether the executors had been advised of Nicklas' negotiations does not appear. At all events, in April, 1945, Robert J. Kauss, one of the executors, employed Minnemeyer. Mary Boyce, the other executor, on April 17, 1945, conducted him through the property and gave him the key to it. He was told that the executors "wanted to get the biggest figure they could, but it was established at thirty thousand dollars." Several days after his employment Minnemeyer procured a prospective purchaser, a Mr. Sunseri, who offered $20,000, and posted his check for $1000. He presented this proposition to Kauss, who then for the first time informed Minnemeyer that it had always been Mr. Follansbee's desire that the Masonic Fund Society be given the first opportunity to purchase the property. He authorized Minnemeyer to offer it to the society, since he (Kauss) was a member and did not wish to negotiate with it. On April 30, 1945, Minnemeyer wrote to the society: "We have a bonafide [sic] cash offer for the Follansbee residence . . . It was always Mr. Follansbee's wish that the Masonic Society should have the first opportunity to purchase this property. Would the Society be interested in the purchase of this property?" He also telephoned to Paul B. Brown, the president of the Society, informed him that the price

was $30,000, and Brown told him that the society was not interested in purchasing real estate at that time. When he reported this attitude to the executors, Kauss authorized him to sell the property to the society for $22,500. On May 10, 1945, Minnemeyer wrote to Brown that the price had been reduced to $22,500, and that the executors were "anxious to dispose of the property at the present time and as I have told you, they have an offer pending."

At this point, it will be observed, the society was faced with two prices: $25,000, the Nicklas offer; $22,- 500, the Minnemeyer offer. Brown responded to the Minnemeyer letter of May 10th by advising him via telephone that "he wanted to take it up with the executor of the estate himself personally", and Minnemeyer so informed Paul and Kauss. Kauss indicated his willingness to meet the society's representatives, and instructed Minnemeyer to hold Sunseri's hand money pending the negotiations. On June 15, 1945, Sunseri executed a written contract of purchase. This agreement was not executed by the executors, and on July 12, 1945, Kauss directed Minnemeyer to return Sunseri's down money.

On July 17, 1945, Minnemeyer again communicated with Brown who requested that he call again on July 24; when he complied with this request, Brown refused to discuss the matter. On the same day Kauss told him that there wasn't "anything that he would report to me". Minnemeyer was never dismissed by the executors, the key to the premises was never recalled, and his first knowledge of the sale was secured when he read the December 11, 1945 edition of the Pittsburgh Legal Journal.

Meanwhile events were occurring of which Minnemeyer had no knowledge. His letter of May 10th was presented to the society, and the board instructed Stanier that since he had been dealing with Nicklas "there is nothing to do with this letter." On June 5, 1945, the board instructed the president and secretary to meet

with the representatives of the estate, and were authorized to offer $18,000 for the property. Stanier notified Nicklas of that action, and Nicklas arranged a meeting for July 11th which was attended by Nicklas, Stanier, Brown, Paul, Kauss and Mrs. Boyce. It is said that no agreement was then reached but Nicklas testified that "it was intimated pretty strongly . . . that the property probably could be bought for twenty-two five". At all events, the board on July 24, 1945, decided to purchase at $22,500, and on October 18, 1945, the executors executed a deed for the premises which was not recorded until December 10, 1945.

Who, under the facts, supplied the efficient, procuring or inducing cause of the sale? *Keys v. Johnson,* 68 Pa. 42. Who originated or set in motion the series of events which culminated in the sale? 12 C. J. S., Brokers, section 91.

This is a question of fact. *Shapira v. Union Trust Co.,* 306 Pa. 35, 158 A. 564; *Gibbons v. Monongahela River Con. C. & C. Co.,* 68 Pa. Superior Ct. 232. Had the auditing judge's adjudication been sustained by the court en banc we would have been bound by it. *Gibson's Est.,* 161 Pa. 177, 28 A. 1079. But his adjudication was overruled, and it is our duty to examine the entire record to determine whether the action of the court en banc was justified. *Curran's Est.,* 310 Pa. 434, 165 A. 842. There is no question concerning the credibility of the witnesses and no dispute about the essential facts. The answer depends upon the inferences and deductions which are to be drawn from the facts, and these an appellate court may deduce for itself, whatever may have been the finding below. *Jac Est.,* 355 Pa. 137, 49 A. 2d 360.

Our analysis of the testimony has brought us to the side of the majority in the court below. In our search for the paramount inducing cause we find that the central fact, virtually the controlling fact, is that the society bought only after Minnemeyer communicated the price

at which it bought. His letters, especially that of May 10th, spurred the society into action. Until then the negotiations were in a fluid state. The efforts of Nicklas extending from October through April had not produced the will to buy; they were, to quote Judge BOYLE, "abortive efforts". The board had taken no decisive action; at most it had resolved on December 5, 1944, "to contact the attorney for the estate" who, it understood, was Nicklas, and "to secure from him a price, *it not being* the idea to purchase unless a low sale price is quoted." (Emphasis added). When an acceptable price was quoted it emanated from Minnemeyer, and then the situation rapidly hardened. What had theretofore been vague in the collective mind of the society suddenly became clear. The resolution of June 5th followed within three weeks, and by July 11th the society was definitely committed to the project, needing only the formal confirmation of July 24th. Thus what Nicklas had failed to accomplish in six months followed within two months after Minnemeyer's employment.

In addition to the price, Minnemeyer's letters carried a potent force and a stimulant to activation, the like of which Nicklas was not able to apply at any time in the course of his long negotiations. Minnemeyer's statement that he had a bona fide offer was true, and its effect was to galvanize the society, to transform it from a hesitating prospect into a willing buyer. Sunseri was a bona fide and a willing purchaser; he deposited $1000 as evidence of his sincerity; he signed a written purchasing agreement; and after the society bought the Follansbee property he purchased premises directly across the street from it. So long as no competing purchaser appeared the society could dally, and continue to dangle $18,000 before the eyes of executors who were bound to sell. This actual threat by an able and willing purchaser to the society's acquisition of the property in a location where it owned the surrounding real estate produced a sharp and decisive reaction. Though it still formally stood

upon its offer of $18,000, it quickly agreed to $22,500. Minnemeyer's actual customer was an effective lever in producing a sale at the price he quoted.

The society, understandingly partial to one of its own, speaking through Stanier, considers the meeting of July 11th, attended by Nicklas, as having produced the conviction to buy. A purchaser is undoubtedly competent to "tell how he bought, in consequence of what cause": *Earp v. Cummins*, 54 Pa. 394, 396. But actions speak louder than words, *Graham v. Dempsey*, 169 Pa. 460, 32 A. 408, and the testimony of a buyer cannot nullify documentary evidence and the plain and inevitable inferences drawn from other uncontradicted testimony. Stanier reaches his conclusion, and his testimony amounts to a conclusion only, by reference to the board's informal advice that Minnemeyer's letter be ignored, its instruction that he continue to deal with Nicklas, and Brown's determination to deal directly with the executors. Neither course, that is, continued dealing either with Nicklas or directly with the executors, could deprive Minnemeyer of his commission if his efforts were the inducing cause. *Girsh v. Rolland*, 285 Pa. 141, 131 A. 723; *Key v. Johnson*, supra; *Smith v. Zell*, 85 Pa. Superior Ct. 114; *Walker v. Randal*, 85 Pa. Superior Ct. 443. The society could indeed ignore Minnemeyer's letter and deal with others, but it cannot deny that the first information it had of the price at which it eventually bought was brought to it by Minnemeyer, nor that it was his letter that sparked it into motion.

For that reason the meeting of July 11th is relatively unimportant in the search for the inducing cause. That the society agreed to purchase at that meeting seems clear, for immediately thereafter the executors instructed Minnemeyer to return Sunseri's $1000 check. But that the price was actually fixed for the first time as the result of the deliberations of the meeting is not credible. True, there was some chatter, usual to real estate transactions, about the value of the property, and

proposed figures were advanced and rejected by the parties. The society, abandoning its $18,000 offer, sought to buy at $20,000; and there was "an offer by Mr. Paul [attorney for the estate] that he thought twenty-five thousand dollars was the correct figure". But both parties knew of Minnemeyer's offer, and Nicklas frankly testified that "it was intimated pretty strongly" that it "probably could be bought for twenty-two five". Of course, it was "intimated pretty strongly", for that was the price at which the executors had already indicated they would sell, and that was the price which the society was apparently willing to pay. The price was not fixed at the meeting. The meeting merely affirmed a price that had been previously established.

But, apart from all else, Nicklas cannot recover. He was not employed by the executors. He was a mere volunteer, and even if his efforts had induced the sale he could not have recovered. *Samuels v. Luckenbach,* 205 Pa. 428, 54 A. 1091; *L. M. Hagedorn & Co. v. Godwin & Strauss,* 142 Pa. Superior Ct. 547, 16 A. 2d 649; *Lanard & Axilbund v. Thomson Printing Co.,* 84 Pa. Superior Ct. 199. He recognizes this, but contends that the attorney for the estate authorized his activities, and that, in all events, the executors by adopting his acts accepted his agency. *Keys v. Johnson,* supra, p. 44. It does not appear that the executors' attorney authorized Nicklas to act for the estate; certainly he did not expressly employ Nicklas as an agent; had he done so without the express sanction of the executors he would have exceeded his powers; and the estate would not be liable for the commission. *Zellner v. Murdoch,* 298 Pa. 208, 148 A. 109; *Gross v. Kincaid,* 83 Pa. Superior Ct. 514.

Nor did the executors accept Nicklas as their agent or adopt his acts. They knew him only as the attorney of a legatee, who, equally with themselves, was interested in securing the best possible price for a property they were commanded to sell. They never adopted his acts; the price at which they sold was offered under their

direction by Minnemeyer; Nicklas had offered it at $25,000. If it can be said that the executors adopted the acts of any one, they adopted Minnemeyer's. The fact that they notified the legatees prior to the consummation of the sale that Nicklas *claimed* a commission recognized his *claim* but not his *right* to it.

That the executors appeared in this court as the exponents of the Nicklas claim means nothing. Their brief advocating his claim is not an adoption of his acts. Their attitude has been equivocal. They did not assist the court below by testifying to their knowledge of the facts. They advised the auditing judge: ". . . it is their desire to make no contest so far as the estate is concerned concerning this matter [the claims for commissions] and ask it be submitted to the Court". The auditing judge found for Nicklas, and they excepted. Their exceptions were sustained by the court en banc which allowed Minnemeyer's claim, and they appealed to this court. In an effort to avoid liability ·for two commissions they have alternately favored both claims, and their oscillations help no one. See *Girsh v. Rolland,* supra. Indeed, since they have not been surcharged, they have no interest in the controversy, and their appeal will be quashed. *Reese's Est.,* 317 Pa. 473, 177 A. 792; *Hand's Est.,* 288 Pa. 569, 136 A. 864. They had no standing to except to the adjudication of the auditing judge, and the court en banc, upon proper application, would have stricken off the exception qua executors, although it might possibly have permitted one of them, Mrs. Boyce, who is a residuary legatee, to retain its benefits in her individual capacity. *Holben's Est.,* 299 Pa. 348, 149 A. 598; *Cheponis' Est.,* 148 Pa. Superior Ct. 515, 25 A. 2d 779. The validity of the exception, in the absence of a motion to strike in the court below, cannot be raised here. *Kaufmann's Est.,* 293 Pa. 73, 141 A. 852.

Since the legatees admit that one commission in the sum of $1075 is due, the decree of the court below did not

diminish their shares as distributees. Hence they are not parties aggrieved by the decree, and have no standing to appeal. Without disturbing the exception taken by Mrs. Boyce to the adjudication of the auditing judge for the reason already stated, the appeals of the legatees to this court will be quashed.

Appeals Nos. 9, 11, 12 and 13 are quashed.

In No. 10, the appeal of Nicklas, the decree is affirmed, costs to be paid by the estate.