458 A.2d 946

Thomas S. CHRISTO and Blanche Greenberger, Appellants

v.

BRITTANY, INC.,

v.

Antoinette B. TCHIRKOW, individually and as Executrix of the Estate of Edgar G. Tchirkow, Deceased; and Drusilla M. Goll and William A. Rennekamp, Executors of the Estate of Phoebe M. Rennekamp, Deceased for Phoebe M. Rennekamp, individually and as Executrix of the Estate of William A. Rennekamp, Sr., Deceased; Tuscany, Inc., Brittany, Inc., and Maple Heights Corporation,

v.

MAPLE HEIGHTS CORPORATION,

v.

TUSCANY, INC.

Superior Court of Pennsylvania.

Argued April 27, 1982.

Filed March 4, 1983.

Reargument Denied May 13, 1983.

Petition for Allowance of Appeal Denied Oct. 3, 1983.

John E. Evans and James W. Daub, Pittsburgh, for appellants.

Scott E. Henderson and Maurice A. Nernberg, Jr., Pittsburgh, for appellees.

Before ROWLEY, BECK and MONTEMURO, JJ.

MONTEMURO, Judge:

This is an appeal from the lower court's orders granting summary judgment in four consolidated cases in favor of defendants, owners of certain apartment buildings, and against plaintiffs, real estate brokers, claiming entitlement of brokerage fees.

The appellants herein, plaintiffs below, Thomas S. Christo and Blanche Greenberger [hereinafter Christo and Greenberger respectively] are real estate brokers in Allegheny County. The appellees herein, defendants below, include

Antoinette Tchirkow and Phoebe Rennekamp [1] [hereinafter Antoinette and Phoebe] who are shareholders, in varying proportions, of the three defendant corporations—Brittany, Inc., Tuscany, Inc., and Maple Heights Corporation [hereinafter Brittany, Tuscany and Maple Heights respectively]. Each corporation was owner of one apartment building— The Brittany, The Tuscany and the Normandy, respectively.

In September, 1975, following the death of Edgar Tchirkow (and many years after the death of William Rennekamp), Antoinette and Phoebe decided to put the buildings up for sale. Antoinette retained attorney Maurice Nernberg to advise her concerning the sale. Attorney, Frank Mast, was retained by William Rennekamp to assist and advise Phoebe concerning the sale.

In October, 1975, appellant Christo, a friend of the late Edgar Tchirkow, approached Antoinette inquiring about the purchase of the buildings. Christo asserted that he wished to purchase the buildings for himself. He was referred to Nernberg to whom he made an offer of $1,350,000.00 which was rejected. Nernberg then provided financial information regarding the building to Christo by letter. The letter ended with the following provision. "REQUESTED PRICES ARE NET—SELLERS WILL PAY NO COMMISSIONS, NOTE: These documents are for private use only, and may not be shown other than for your use as a principal."

Christo subsequently made a second offer to purchase the buildings for $1,450,000.00; this, too, was rejected since no offer of less than $1,550,000.00 *net* to the owners would be considered.

At this point Christo began looking for a buyer who would pay the figure demanded by the owners. Christo contends that he did this at the behest of Mast. Specifical-

---

**1.** Antoinette Tchirkow and Phoebe Rennekamp were named as defendants, both in their own right and as the respective executrixes of their deceased husbands, Edgar Tchirkow and William Rennekamp. Phoebe Rennekamp has also died in the course of this litigation and her interest is currently represented by appellees, Drusilla Goll and William Rennekamp.

ly, he asserts that in December, 1975, he saw Mast at the Duquesne Club eating lunch and Mast said "Tom, get yourself an offer of fifteen-five for the package. You're going to make yourself a deal." The appellees dispute this assertion stating that all dealings with Christo were based on the assumption that he was acting for himself only, not as a broker for third parties. The issue is further clouded by contradictory statements of appellant Christo given during his depositions on August 3, 1976. For example:

Q. All right. Now, tell me again, Mr. Christo, what they stated with respect to your trying to get somebody to buy these building?

A. Well, they told me that it would have to be cash, there would be no strings attached to them, it would have to be net and thereafter, I listed the services of Mrs. Blanche Greenberger.

Q. Let's go back, Mr. Christo. Who told you this?

A. What do you mean, "Who told me this"?

Q. Well, you testified that you were told, I gather, to find a buyer. Is that correct?

A. I tried to find a buyer. They didn't try to find a buyer.

Q. Did they request that you do that?

A. No.

Q. They did not request it. You were just doing this on your own. Is that correct?

A. Sure.

Q. All right. N.T. p. 20

And also:

Q. Did you tell Mrs. Greenberger about who you were representing?

A. I told her the buildings were available. I didn't represent anybody. I knew they were available and there had to be an offer made for fifteen-five, $1,550,000. That would be the only offer that would ever be considered.

Q. But you didn't tell Mrs. Greenberger that you were the agent for the seller?

A. I was not an agent for the seller.

Q. Did you ever tell Mrs. Greenberger that you were an agent for the seller?

A. Not being in the real estate business, Mrs. Henderson, you probably wouldn't know the ethics among real estate people. We talk to each other about deals, you understand what I mean, and that's how we do business.

Q. Well, did you ever tell Mrs. Greenberger that you were an agent for the corporation which owned the buildings?

A. No. I told her I was not an agent. N.T. pp. 24–25

And further:

Q. In paragraph nine of your complaint it is stated that you were authorized to list the buildings for sale. Is that correct?

A. I didn't get that.

Q. Well, look at paragraph nine, which is in front of you, Mr. Christo.

A. Yes.

Q. Do you see the part in the fourth line regarding "to list for sale"?

A. Well, they did not actually list these properties. They told me about them, I knew about them. I was just trying to find a buyer. That's all.

Q. They didn't tell you to list them for sale. Is that correct?

A. I don't know what you mean by listing.

Q. I'm asking you, it's in your complaint.

A. Well, when they talk about properties like this, they really list them with you.

Q. Did you ever have a listing agreement with Maple Heights Corporation?

A. No.

Q. Did you have any written agreement with either the Tuscany or Brittany Corporations?

A. I didn't have no listing period.

260

Q. Did you ever tell Mrs. Greenberger that you had a listing?

A. I told Mrs. Greenberger about the buildings. I told her that they were available. I didn't have a listing or contractual relation between the seller or the properties we listed with me in any way. I told her about them and she went out and got a buyer.

Q. Did you have any understanding with Mr. Mast regarding any commission you might get?

A. No commissions were ever discussed. N.T. pp. 40, 41

And further:

Q. Did you ever become an agent of the corporations for the purpose of selling these buildings?

A. No.

Q. Did you ever become an employee of the corporations for the purpose of selling these buildings?

A. No.

Q. Did you ever become an agent for Mr. Mast for the purpose of selling the buildings?

A. No.

Q. Or Mr. Nernberg?

A. No. I was not considered an agent.

Q. Who were you representing when the offer was made by Mr. Zytnick?

A. Well, it was an understanding between myself and Mrs. Greenberger.

Q. What was that understanding?

A. That we were to be co-brokers to sell these properties and that culminated the offer or brought upon the offer. N.T. p. 69

And finally:

Q. Was there anything else that was said during those conversations?

A. No. Not that I recall.

Q. Did Mr. Mast say anything about your authority in this matter?

A. My authority was never questioned as long as we got a million, five-fifty.

Q. What was you authority, sir?

A. I had no authority of any kind. I was just acting on my own. N.T. p. 73.

In any event, Christo enlisted the services of appellant Greenberger as a co-broker. In March, 1976, Mrs. Greenberger and her associate produced a prospective buyer, Allan Zytner. Before the owners would allow Zytner to inspect the buildings, Christo and Greenberger were required to sign a letter disavowing any agency relationship with the owners and agreeing to indemnify the owners for any commission payments for which they might become liable.[2]

2. The letter dated March 9, 1976, addressed to Frank Mast, Esq., and Joseph D. Shuman, Esq., signed by Thomas S. Christo stated:

Gentlemen:

Mr. Maurice A. Nernberg, Jr. previously furnished me with certain financial statements relating to the operation of the apartment buildings known as the Tuscany (Washington Road, Mt. Lebanon), the Brittany (Brownsville Road, Brentwood) and the Normandy (Fifth Avenue, Pittsburgh). Such statements were furnished to me as a prospective purchaser of these properties. Accordingly, I have not been and am not now retained by you, your clients, Mr. Nernberg, or his clients to represent anyone of you in attempting to sell such real properties or the stock of the corporation which own such real properties.

Blanche Greenberger, with whom I have been associated in prior real estate transactions, has advised me that a client of hers is willing to make an offer to purchase such real properties for the sum of $1,550,000 on an "as is" basis. It is expressly understood that you, your clients, Mr. Nernberger and his clients have not and will not make any representations and warranties with respect to these properties, other than the ownership thereof. The price of $1,500,000, payable to your clients, will be net of all commissions, fees or transfer tax stamps, inasmuch as the purchaser will pay all transfer taxes and any and all commissions and fees.

I do hereby represent and warrant that the only parties who have acted as brokers, agents or finders in connection with this proposed transaction are Mrs. Greenberger and myself. Accordingly, Mrs. Greenberger and I agree and do hereby indemnify you, your clients, Mr. Nernberg and his clients, against any liability for commissions and fees which may be payable to any party whatsoever who may have acted or may act as a broker, agent or finder in connection with this transaction, and do further indemnify you, Mr. Nernberg, your clients and Mr. Nernberg's clients against all costs (including

Zytner then offered to purchase the buildings. He signed a short form sales agreement and tendered a check payable to Thomas S. Christo in the amount of $50,000.00 in "hand money"; both of which were delivered to Christo who relayed them to Mast. Subsequently, the offer to buy was rejected by the owners, who had received other offers for more money.

Christo and Greenberger then brought actions in assumpsit and trespass against the individual and corporate defendants alleging in one count a breach of a brokerage contract, and in a second count that each defendant corporation tortiously interfered with plaintiff's contractual relationship with the other two corporations. After extensive discovery, defendants filed motions for summary judgment in each action. After a hearing, the lower court granted summary judgment in favor of the defendants and plaintiffs appealed.

Appellants contend that the summary judgment was improperly granted because a genuine issue of material fact exists as to whether or not a brokerage contract between Christo and the defendants is extant. Christo asserts such a contract was created by the alleged requests of Mast subsequent to the rejection of Christo's offers to purchase the properties. The entire issue is complicated by the contradictory statements made by appellant Christo, in his deposition and by the letters signed by Christo and Greenberger disavowing any contractual relationship with the appellees.

■ A summary judgment can only be granted in cases where there is no genuine issue of any material fact and where the moving party is entitled to judgment as a matter

legal fees), loss, damages or expenses which may arise by reason of the assertion of any claim against any of such parties for any such commissions and fees. This letter does not constitute an offer to purchase and any such offer shall be embodied in a formal Agreement of Sale in which Mrs. Greenberger's client will also represent that he has not dealt with anyone other than Mrs. Greenberger and me as brokers, agents or finders in connection with this proposed transaction and he will indemnify you, Mr. Nernberg, your clients and Mr. Nernberg's clients against such liabilities as are described in the preceding sentence.

of law. Pa.R.C.P. 1035. In determining whether there is a dispute of material fact, the court must take that view of the evidence most favorable to the non-moving party, giving to that party the benefit of all favorable inferences that might reasonably be drawn from the evidence, and thus placing the burden of proving the absence of any factual issue on the moving party. *Badami v. Dimson*, 226 Pa.Super. 75, 310 A.2d 298 (1973).

The appellees' motions for summary judgment were premised upon the absence of any brokerage contract between Christo or Greenberger and the appellees. To substantiate this contention they relied principally on the admissions in the deposition testimony of Christo and the letters of Christo and Greenberger denying any brokerage relationship.

It is clear that the appellants, Christo and Greenberger, must be able to prove that either an express or implied brokerage contract existed between themselves and appellees in order to maintain a viable cause of action. This is because any acts performed by the appellants as mere volunteers will not entitle them to a recovery. Our Supreme Court stated in *Axilbund v. McAllister*, 407 Pa. 46, 180 A.2d 244 (1962):

> In this area of the law certain principles are well established: (1) *a broker cannot recover a commission, even though he brought the seller and buyer together, unless he can prove a contract of employment, express or implied, oral or written, between himself and the buyer (or seller) or an acceptance and ratification of his acts by the buyer (or seller):* (2) in the absence of an exclusive agency, if the actions of a broker constitute the efficient cause of the production of a buyer (or seller), he is generally entitled to his commission even though the sale was finally concluded or completed by the seller (or buyer) himself, or another broker; (3) the mere fact that a broker has carried on negotiations with a prospective buyer (or seller) does not entitle the broker to a commission unless his efforts constituted "the efficient procuring

cause of the sale," ... (footnotes omited) (emphasis added).

Id., 407 Pa. at 55–56, 180 A.2d at 249. See also *Re Trust of Coho*, 421 Pa. 448, 219 A.2d 657 (1966); *In Re Follansbee's Estate*, 161 Pa.Super. 31, 53 A.2d 864 (1947).

Therefore, in the present case our inquiry is focused upon whether or not Christo and Greenberger's allegations of a brokerage contract based upon the alleged requests by Mast to procure a purchaser are sufficient to create a genuine issue of material fact and thus withstand appellees' motions for summary judgments. We find they are not.

If our decision were based solely upon the restaurant conversation between Christo and Mast, quoted *supra*, we would be required to reverse the lower court's decision and allow this case to proceed to trial since the question of whether Mast's alleged request created a contract is one for the fact finder to determine. However, we find that the relationship between the appellants and appellees at the times relevant to this cause of action is controlled by the letters of Christo and Greenberger of March 9, 1976, to Frank Mast quoted *supra*.

■ Regardless of whatever effect Mast's request made in December, 1975 had, it is clear that at the relevant time, that is, prior to and at the time of the prospective purchaser's offer to purchase the apartment buildings, the understanding of the parties was that no brokerage contract existed between appellants and appellees.

Furthermore, the letters not only militate against a finding of a brokerage contract, but also contraindicate the existence of any acceptance or ratification of appellants' acts by appellees. *Axilbund v. McAllister, supra.*

Because there was no contractual arrangement between the appellants and appellees we must conclude that appellants were acting as mere volunteers with respect to the procurement of a purchaser of appellees' properties, or that they ultimately sought remuneration from the purchaser. In any event, the lack of any issue of material fact and law

relevant herein requires a finding that judgment was properly granted in favor of appellees.

Accordingly, we affirm the orders of the lower court.