# Mitchell *v.* Baldwin Locomotive Works, Appellant.

*Principal and agent—Broker—Commissions.*

In an action to recover commissions on a contract alleged to have been procured by plaintiff, no recovery can be had where the evidence shows that the contract was not procured through plaintiff's efforts, or through the agency of any person whom plaintiff had introduced to defendant, but was solely the result of the consummation of previous pending negotiations originated through a different source, of which plaintiff had notice.

Argued March 4, 1919.    Appeal, No. 114, Jan. T., 1919, by defendant, from judgment of C. P. No. 4, Philadelphia Co., March T., 1916, No. 1600, on verdict for plaintiff in case of Howard E. Mitchell v. The Baldwin Loco-

motive Works, a corporation of the State of Pennsylvania, Appellant, Eddystone Ammunition Corporation, a corporation of the State of New York; and Remington Arms Company, a Corporation of the State of Delaware. Before BROWN, C. J., STEWART, MOSCHZISKER, FRAZER, WALLING and KEPHART, JJ. Reversed.

Assumpsit to recover commissions on a contract alleged to have been procured by plaintiff. . Before CARR, J.

Verdict and judgment for plaintiff for $218,750. Defendant appealed.

*Error assigned* was in overruling motion for judgment for defendant n. o. v.

*F. B. Bracken,* with him *Morgan, Lewis & Bockius* and *Prichard, Saul, Bayard & Evans,* for appellant.—There is no evidence that the negotiations which appellee claims he was employed to conduct had any connection with the particular contracts procured by appellant, or that they contributed, or if not interrupted, would have contributed in any way to the procurement of these contracts: Macneir v. Wallace, 252 Pa. 323; Turner v. Baker, 225 Pa. 359; Groskin v. Moore, 249 Pa. 242.

*Wm. A. Glasgow, Jr.,* with him *Chester N. Farr, Jr.,* for appellee.—Plaintiff was entitled to recover: Jackel v. Caldwell, 156 Pa. 266; S. V. Thompson Co. v. Goldman, 41 Pa. Superior Ct. 209.

OPINION BY MR. JUSTICE FRAZER, June 21, 1919:

Plaintiff sued to recover commissions alleged to be due for services rendered defendant in procuring contracts for the manufacture of munitions for the allied governments, who were at the time engaged in war with Germany. The defense relied upon was that plaintiff had not been authorized to act for defendant and that no contract was entered into as a result of plaintiff's negoti-

ations whereby the latter would be entitled to compensation. The various questions raised at the trial were submitted to the jury and a verdict rendered for plaintiff for $218,750, on which judgment was subsequently entered after refusal of a motion for judgment for defendant non obstante veredicto.

To establish his right to receive compensation plaintiff relied upon a series of letters and interviews between him and Alba B. Johnson, president of defendant company. The first interview was on April 20, 1915, at which time plaintiff submitted to Johnson a letter received from one Mottelay, of London, stating the writer was "in very close touch" with buyers of certain allied governments, and at the time had orders for 5,000,000 shrapnel cases "for cash and a commission of 7½%," and requesting an opportunity to place the matter before American manufacturers. Johnson asked for specifications and, in a letter affirming the interview, stated his company would not quote prices for steel cases unless an actual contract for the shells, evidenced by drawings and specifications, was in existence, and that his company was ready to accept such orders dependent upon condition of their work at the time, provided payments were properly guaranteed. On May 17th, plaintiff wrote Johnson enclosing blueprints and in referring to the commissions charged by his English correspondents called attention to the absence of reference to commissions for him (plaintiff) and stated: "I will, therefore, ask you to be good enough to consider that I would be entitled to some commission to be agreed upon between us." In reply to this letter estimates were given by Johnson in which it was stated: "the price quoted includes commissions aggregating 6%." The proposal was never accepted, however, and nothing further was done. At this "identical time" Johnson informed plaintiff he was also submitting a proposal for similar work to J. P. Morgan & Co., agents for the British government, and inserted in the letter, quoting a price to plaintiff, the fol-

lowing statement: "The print sent appears to be an obsolete design of shell no longer purchased by the French government. Our quotations to others have been based upon a later design......This proposal is made subject to prior engagement of our facilities, and, in the event of acceptance of other proposals which we have outstanding, this offer would be withdrawn." Subsequently, on June 25, 1915, Mottelay cabled plaintiff that he had "opened important negotiations with the British government involving purchase entire output munitions of both companies referred to in your letter 20th April for period of war. Terms of contracts would be settled in America direct between companies and British government's representative who sails for America immediately. Urgent that you at once obtain agreements from both companies covering commission on terms already arranged on all business placed with them by British government." Plaintiff showed this cablegram to Johnson, who, according to plaintiff's testimony, said that if his company came in contact with the British representative through the efforts of plaintiff and his associate and negotiations resulted in a contract, a "suitable commission would be paid" them for "services so far rendered and to be rendered." Plaintiff also testified that Johnson informed him their counsel had advised the company it could not legally enter into contracts for making war munitions directly, and suggested taking the matter up with a Mr. Wiggin, of New York, who was interested in the formation of a separate company for taking over such contracts. Plaintiff interviewed Wiggin with the result, as he stated in his letter to Johnson of June 30, 1915, that "nothing definite was arranged along the lines as suggested in the cablegram which I received from Mr. Mottelay and which I showed to Mr. Wiggin. If the future develops that Mr. Mottelay and I are entitled to a commission, I will deem it a favor if you will be good enough to bespeak for us a good word with Mr. Wiggin at the opportune moment." In the meantime Mottelay and his

associate secured the sending of a cablegram to D. A. Thomas, now Baron Rhondda, a representative of the English government who was on his way to America, requesting him on his arrival at New York to meet plaintiff regarding negotiations for the purchase of the entire output of munitions manufactured by several large American plants during the period of the war. Mottelay thereupon cabled plaintiff as follows: "At our request government have officially cabled Thomas to receive Mitchell as representing important group manufacturers including the three companies whose names have been officially placed before government. We have thus secured highest official credentials you must arrange meeting on arrival of Thomas." A copy of this cable was submitted to Johnson in a letter from plaintiff under date of July 1, 1915, in which letter it is stated: "The real object of this letter is to ask you to be good enough, when definite negotiations are opened, to consult with me in connection with having such price as you may name to the British government include a suitable commission to be agreed upon to be paid to me for my services as well as those of Mr. Mottelay." Replying to this letter the following day Johnson said: "As stated in our interviews, under advice of counsel these works are not legally authorized to undertake contracts for projectiles or other war materials outside of the purposes designated in its charter. For this reason, we are unable to quote you or any other party, for such materials." A few days later Thomas arrived in New York and plaintiff called upon him and later wrote Johnson advising him of his interview with Thomas and that he had informed the latter that his (plaintiff's) interest in the matter was "to receive a reasonable commission from the manufacturer to compensate Mr. Mottelay and me for our services so far rendered and to be rendered in the future, provided contracts result from negotiations." With this letter he enclosed a copy of one addressed to Thomas and requested to be advised if such letter correctly stated defendant's

relation in the matter. In the Thomas letter, after referring to the facilities of defendant company, plaintiff states: "If you think it advisable to negotiate for the engagement of these facilities, I shall be very glad to report the same to Mr. Johnson and arrange that you will be brought into contact with the proper party for a conference, unless their negotiations with Messrs. Morgan & Company should make it undesirable for the company to do so. Mr. Johnson has naturally made no definite agreement with me, but should business be consummated it is expected that a reasonable commission will be paid to compensate Mr. Mottelay and me for our services." To this Johnson replied that "the letter expresses correctly the negotiations which have passed between us relative to the supply of shells. In view of the condition which the other negotiation has now reached, it would not be expedient for us to proceed with a parallel negotiation until that is disposed of. For this reason I think it would be better not to make an engagement to meet Mr. Thomas." In answer to the letter to Thomas the latter's secretary, under date of July 15, 1915, replied that Thomas "has been in direct communication with the J. G. Brill Company and the Baldwin Locomotive Works and has been assured by responsible officers of both these firms that you are not in any way authorized to represent them. Mr. Thomas asks me to repeat to you that he has made it his practice to deal only with responsible heads of manufacturing firms, or with their duly accredited agents, and to say that, in these circumstances, he does not see his way clear to correspond with you further in regard to the supply of munitions of war." Nothing further was done until November 23, 1915, at which time plaintiff wrote Johnson demanding commissions on munitions manufactured under contracts procured through plaintiff's efforts, to which Johnson replied disavowing the alleged agency of plaintiff and denying that any contract for war materials was entered into pursuant to negotiations by plaintiff, or through his instrumentality.

In the meantime defendant company, previous to the original interview between plaintiff and its president, had manufactured for the British government a number of shell cases under contracts, which were loaded by other firms. Following the execution of those contracts the British government appointed J. P. Morgan & Company its American agents and at various times during April, 1915, specifications for shell cases were submitted by that firm to defendant, one being for 100,000 cases for which a contract was made April 26, 1915. From that time, covering a period of about eighteen months, similar contracts were made from time to time for various war supplies, the total amount aggregating over $33,-000,000. In April, 1915, Samuel M. Vauclain, vice-president of the Baldwin Locomotive Works, during a visit to Russia, arranged for an order for rifles to be filled by the Remington Iron Company of Connecticut. Upon his return he was invited to join with others in the organization of a company for the manufacture of rifles for the British government to which he consented on condition that a factory be erected at Philadelphia so as to be convenient for him to handle the business in connection with his duties with defendant company. Subsequently the Baldwin Locomotive Works agreed to construct necessary buildings on land belonging to it at Eddystone, and lease the property to the new company, the structures to be erected in such manner as to be subsequently available for the manufacture of locomotives. Later a company known as the Remington Arms Company of Delaware was formed and a formal lease executed April 30, 1915, between that company and the Baldwin Locomotive Works. There is no evidence to show that plaintiff had any connection whatever with this contract and lease.

While in Russia Vauclain was also requested by the Russian government to take up the manufacture in the United States of loaded shells. Upon his return and during the early part of April, 1915, this matter was again suggested by Morgan & Company on behalf of the

British government and was considered by the board of directors of defendant company; but, on advice of counsel, the company decided its charter did not permit the manufacture of loaded ammunition. A suggestion followed that a company be formed for the purpose of making shells, and that the Baldwin Locomotive Works erect buildings on its vacant land to be leased to the company in the same manner as it had leased other property to the Remington Arms Company. Accordingly, the Eddystone Munition Corporation was formed of which Vauclain was managing director and a stockholder, in which, however, the Baldwin Locomotive Works, as a company, was not interested. The munitions corporation, under date of July 23, 1915, entered into a contract with the British government, through J. P. Morgan & Company, for the manufacture of shells pursuant to previous negotiations extending over a period of practically two months. We find no evidence that plaintiff had any direct connection with the making of these contracts, other than such as may be inferred from the interviews and letters heretofore referred to between him and Johnson.

A careful consideration of the evidence in a light most favorable to plaintiff fails to establish the slightest right on his part to recover commissions from defendant. The letters indicate quite clearly that the claim to commissions was dependent upon completion of negotiations through efforts of plaintiff and his associates. The only bid for work submitted through plaintiff concededly produced no results and it is even doubtful from the evidence if that order was a bona fide one. Plaintiff was aware that other negotiations were pending at the time through Morgan & Company as agents of the British government; was definitely told that his right to commissions was subject to the earlier completion of the pending negotiations, and finally was informed that, owing to the condition of such negotiations at the time, nothing further could be done toward meeting Thomas, and plaintiff was requested to proceed no further in the

matter. Up to this time clearly no contract entitling him to commissions existed according to plaintiff's admission in his various letters. As late as his letter of June 30, 1915, after having been informed of defendant's inability to bid on the work, owing to its charter restrictions, and being referred to Wiggin as one possibly interested in the formation of a company to handle such contracts, plaintiff asked Johnson to "bespeak for us a good word......at the opportune moment" if the future should develop he and his associate were entitled to a commission. Nothing was done by plaintiff subsequent to that time to entitle him to receive compensation. It is argued, however, he was prevented from earning his commissions by the act of defendant in proceeding to complete negotiations in its own behalf. The answer to this is that the concluding of such negotiations was not, so far as the proof goes, the result of plaintiff's efforts, or through the agency of any persons whom plaintiff had introduced to defendant, but was solely the result of the consummation of previous pending negotiations originated through a different source, of the existence of which plaintiff had notice.

We recognize the general rule that where a broker produces a purchaser who buys the property in question, or is able and willing to do so upon terms acceptable to the principal, he has earned his commission, and in such case the principal may not, pending the negotiations, escape liability for compensation by taking the matter into his own hands and completing the transaction personally. In the present case, however, defendant had been submitting proposals on work for the British and other foreign governments before plaintiff first suggested such contracts to Johnson, of which plaintiff had knowledge, and it was fully understood, as appears from plaintiff's own evidence, that defendant reserved the right to proceed with such negotiations and effect the contracts, if possible, through others who were conceded to be official representatives of the British government. While it is

true contracts were finally made with the very party with whom plaintiff was attempting to deal, yet such contracts were not negotiated through him, but through another. The very condition upon which plaintiff was to be entitled to commissions, to wit, that a contract was actually entered into through his efforts was never fulfilled. Nor is plaintiff in a position to contend he earned his commissions because of the fact that contracts with the British government, with whose representative he had been attempting to deal, were actually consummated at a later date, inasmuch as such contracts were the result of negotiations pending at the time with knowledge of plaintiff and which if consummated would bar any claim on his part for commissions: Groskin v. Moore, 249 Pa. 242.

The judgment is reversed and judgment is directed to be entered for defendant non obstante veredicto.