**County Real Estate, Inc. v. Anderton**

*Allen A. Pechter,* for plaintiff.
*Joseph J. Zapitz,* for defendants.

BODLEY, J., June 23, 1970.—This assumpsit case was tried before the undersigned and a jury on January 15 and 16, 1969. At the conclusion of plaintiff's case, the court granted defendants' motion for a compulsory nonsuit. A motion to take off the nonsuit has been argued before the court en banc and is the subject of this opinion.

The suit is one for a realtor's commission for services allegedly rendered to defendants in connection with the sale of defendants' real estate to tenants procured by plaintiff. It is admitted by the pleadings that prior to March 11, 1961, defendants employed plaintiff to procure a purchaser or tenant for the property in question; that prior to that date plaintiff did procure a tenant; and that on March 11, 1961, defendants entered into a certain lease agreement with one Andrew Lykon and his wife for a period of one year with the right of termination secured to both parties upon the giving of 30 days' written notice of intention to terminate the lease. The lease in question is a standard printed residential-type form lease which defines the term as one year from May 1, 1961, and the rental as $1,200, payable monthly.

In addition to the usual terms found in most printed form leases, there appears in typewriting, among other things, the following paragraph:

"15. Lessees shall have the option to renew this lease at the end of a year, with a possible additional rental of $25 pr. mo. agreeable to both parties. Also lessees shall have first option to purchase property in event of sale with County Real Estate to receive a commission of 10% of the sale price."

At the trial of the case, Ezra I. Miles testified that plaintiff was incorporated on January 5, 1961, by other persons and that he became affiliated with plaintiff corporation on January 19, 1965, through his purchase of 50 percent of the corporation's common stock. This witness conceded that he had no personal knowledge of any contractual arrangements which may have existed between defendants and the corporation prior to, or on the date of, the execution of the lease. He also admitted that he had no knowledge as to what services, if any, plaintiff performed on behalf of defendants prior to, or after, the date of the execution of the lease, and that he had no personal knowledge of the execution of the lease itself. He did admit that the corporate plaintiff performed no services for defendants after January 19, 1965, the date on which he became associated with plaintiff. His knowledge of the transaction was limited to the fact that the lease had existed and that a copy thereof was found in the corporation's file.

The only other witnesses called to testify by plaintiff were the tenants, and subsequent buyers, Andrew Lykon and his wife. The gist of Mr. Lykon's testimony was that while searching for a property in the Levittown area he enlisted the aid of one Mary Mellus, a licensed real estate broker then associated with plaintiff corporation. Through her efforts, he said, he inspected the subject property and thereafter, in his words, he "leased it with an option to buy." He stated that he informed defendants of his intention to buy the property before the expiration

date of the lease, April 30, *1962,* and at that time he offered a price of approximately $21,000 or $22,000. After some negotiations, according to the witness, he and defendants agreed to a sales price of $30,000. Although the witness' testimony is quite confusing with respect to just when certain phases of his negotiations with defendants took place, it is clear that at no time did any representative of plaintiff assist the tenant with the negotiations or with the final arrangements which led to a settlement and the transfer of title on February 23, *1968.*

The witness testified, however, that from May 1, 1961, to the end of the one-year term of the lease he paid $100 per month as called for by the lease. He testified, and this is not challenged, that thereafter, and until some months prior to the 1968 settlement, he paid the sum of $193.31 per month and that receipts for such payments were noted by defendants upon a document entitled "Schedule of Direct Reduction Loan." Across the top of the schedule there appeared the following legend:

*Term:*

| Rate % | Payment $ | Loan $ | Years | Months | Periods |
|--------|-----------|---------|-------|--------|---------|
| 6.00 | 193.31 | $30,000. | 25 | | 300 |

This document was received into evidence and was offered in support of the witness' testimony to the effect that following his agreement to purchase the property at $30,000 he made no down payment but was told by defendants that they would hold a mortgage of $30,000. No mortgage, bond or deed was executed or delivered at the time of alleged sale, but upon the schedule there appears a notation indicating that the first payment of $193.31 was made in May of 1962. The witness maintained that he considered himself to be the owner of the property after that date.

The tenant further testified that he made many improvements to the property between the date of his first leasing it to the date of his securing title in 1968. These included the blacktopping of a parking lot, the installation of a full basement and the like. He estimated that he spent approximately $15,000 on improvements before February 23, 1968, when settlement was finally had. He acknowledged that defendants paid the real estate taxes until 1968 and that he signed no mortgage agreement until that year. He also admitted having signed a "termination of lease" agreement on July 1, 1962, but testified that he did not recall the actual signing.

He told of having asked Mr. Anderton a number of times about the deed to the property, and although it is not clear just when these inquiries were made, presumably one of them was made at or about the time of the alleged purchase in May of 1962, since the witness stated that Anderton told him to wait for a few months "until his (Anderton's) deal with County Real Estate had lapsed." He went on to say that "He told me it would lapse in about three months. This way he wouldn't have to pay County Real Estate a commission." Presumably, this conversation related to the termination of lease referred to above.

The witness acknowledged that on one occasion during the period between May 1, 1962, and the date of settlement in 1968, he purchased certain equipment on a time payment basis and was obliged to secure the signatures of defendants upon a landlord's waiver of distraint. Notwithstanding this and the fact that it was the Andertons and not the witness who paid the real estate taxes during this period, he continued to maintain that he and Mrs. Lykon were the owners of the real estate from May 1, 1962, even though the deed was not executed and delivered by defendants until February 23, 1968.

Lastly, somewhat confusing testimony was offered concerning continuing negotiations between the witness and Mr. Anderton following the expiration date of the lease. For example, he testified that he offered the sum of $25,000 to Anderton but, having no cash, he was told by Anderton to see if he could obtain a loan in that amount. The witness could not recall whether this negotiation was six months, a year or two years after May 1, 1962. He stated that he first went to a financial institution for a mortgage loan in November or December 1967, or possibly early 1968, and that eventually he secured the sum necessary to make settlement, namely $27,838, by way of a mortgage loan only upon Anderton's signing a collateral bond for at least a portion of the loan. It was later stipulated by counsel that this sum, $27,838, was arrived at by taking the balance of the loan, $26,802.18, as shown on the schedule of direct reduction loan, adding thereto interest from July 1, 1967, the date on which Lykon made his last payment of $193.31 to the Andertons, calculated to be $1,036.12, and then rounding off the sum of those figures to the nearest dollar.

Mrs. Lykon testified briefly, but her testimony added nothing of substance to the facts already stated.

As noted heretofore, at the conclusion of plaintiff's case, the court sustained defendants' motion for a compulsory nonsuit, believing that plaintiff had failed to establish by sufficient evidence the existence of an enforceable contract.

A compulsory nonsuit can be granted only when plaintiff's evidence, together with all reasonable inferences viewed in the light most favorable to plaintiff are insufficient to make out a prima facie case. All conflicts in testimony must be resolved in plaintiff's favor upon review: Watkins v. Sharon Aerie No. 327 Fraternal Order of Eagles, 423 Pa.

396, 398 (1966); Forry v. Gulf Oil Corporation, 428 Pa. 334, 337 (1968).

With these principles in mind, we turn to the evidence and note that the only written evidence of the existence of any sort of agency contract, other than that admitted in the pleadings, must be found in these words of the lease:

"Also, lessees shall have first option to purchase property *in the event of sale with County Real Estate to receive a commission of 10% of the sale price.*" (Italics supplied.)

Added to this is the tenant's testimony concerning defendants' alleged expression of their desire to avoid liability for commission to plaintiff corporation upon sale of the property to the tenant. On these facts, plaintiff claims a right of recovery on the theory that it was a third-party beneficiary under the lease agreement.

The law is clear that in order to recover a commission without a showing that the broker was the efficient, procuring cause of the sale, he must establish that an exclusive agency agreement or an exclusive right-to-sell type of contract was created in unequivocal terms or by necessary implication. See Roberts v. Anthony, 9 Bucks 176, 182 (1959). Recovery of a broker's commission should not be permitted when a sale is made directly by an owner unless the contract to pay such commission is clearly established and specifically so provides: Ebbert v. Healy, 9 Bucks 247 (1960). But, of course, the owner cannot avoid payment of commission to a duly authorized exclusive agent, simply by taking the negotiations out of the hands of the agent and completing the transaction himself: Keys v. Johnson, 68 Pa. 42, 44 (1871). Just as clearly, an owner cannot escape liability for the payment of the broker's commission when the broker

is the immediate, efficient and procuring cause of the sale, notwithstanding the absence of an exclusive agency contract. See Axilbund v. McAllister, 407 Pa. 46 (1962).

Plaintiff here does not suggest that it was the immediate and procuring cause of the sale to the tenant. To the contrary, plaintiff acknowledges that the sale, whether it was made in 1962 as alleged, or in 1968 as contended by defendants, was negotiated and completed without plaintiff's even being aware of the transaction.

To recover, then, it must establish by clear and unequivocal evidence that it was entitled to its commission by virtue of the existence of an exclusive agency agreement. This, plaintiff has not succeeded in doing. In view of our conclusion, we need not consider plaintiff's third-party-beneficiary argument nor the question of just when the sale was made.

From plaintiff's brief and argument, we understand its legal position to be that the words in the lease, ". . . in event of sale with County Real Estate to receive a commission of 10% of the sale price" in themselves establish a separate written contract, with defendants being the promisors and the tenants the promisees. Accepting this conclusion, the argument continues, plaintiff is a third-party beneficiary of such contract, since it is the sole party to be benefited by these words and, therefore, it has a right of recovery under that theory.

Plaintiff then goes on to say that although there may be some question as to whether defendants or the tenants agreed to pay the commission, that is for the jury to decide. This is rather a half-hearted concession, since plaintiff also says that custom of the real estate business requires the seller to pay such commissions, so no ambiguity on this score actually exists. Plaintiff urges that the tenant's testimony,

to the alleged fact that defendants had asked him to wait before completing the sales transaction in order that the sellers might be relieved of their obligation to pay plaintiff a realtor's commission, should be taken as defendant's acknowledgment of such an undertaking. And from all of this, plaintiff says, the inference should be drawn that defendants had agreed to pay plaintiff a commission in the first place, and that since a sale actually occurred, the liability followed.

The weakness in plaintiff's position, as we see it, is that plaintiff has failed to establish the existence of a contract, either oral or written, other than the admitted hiring of plaintiff to secure a tenant or buyer. It must be borne in mind that there was absolutely no evidence presented at trial concerning the creation or terms of the initial agency contract between the parties, and no pretense was made by the plaintiff that it had pleaded or proved the precise terms of such agreement. Plaintiff did plead, and this was admitted, that it had been engaged by defendants prior to the date of the execution of the lease to procure a tenant or buyer. It pleaded also, and this, too, was admitted, that it procured a tenant. The bald assertion is then made that the tenant's purchase of the property imposed liability upon defendants to pay a commission under the alleged third-party beneficiary contract. We have no quarrel with the principles of law cited by plaintiff in support of its position, but simply cannot agree that the facts of this case fit the law relied upon.

The paragraph in question provides, without more, that the "lessees shall have first option to purchase property . . ." This is not an option agreement. It is settled that essential to the validity of any option agreement is the statement of a definite price in the contract itself, or one that can be ascertained from the

contract's express or implied provisions: 2 A. L. R. 3d 701. If the agreement provides for a price to be negotiated in the future, the option agreement is rendered invalid as being too vague: Driebe v. Fort Penn Realty Company, 331 Pa. 314, 317 (1938). The words might loosely be called a right of first refusal, but here again, no terms were set forth from which a purchase price could be ascertained, such as that sum contained in a bona fide offer made by another person. Hence, the words used in the lease agreement could not even constitute an offer to sell to the tenant. See Driebe, supra, page 318, by way of contrast. In addition, time is always of the essence in an option contract, and we find no provisions in this lease agreement respecting whether the so-called option might be exercised within a month, a year or 10 years. See New Eastwick Corporation v. Philadelphia Builders Eastwick Corporation, 430 Pa. 46 (1968). Clearly, then, the tenant secured to himself no option to buy under his lease agreement.

But to come to the heart of the matter, it is noted that plaintiff relied upon the leading case of Keys v. Johnson, supra, and upon Herman v. Stern, 419 Pa. 272 (1965), during argument upon defendants' motion for nonsuit at the trial, although these cases are not found in the brief submitted by plaintiff in connection with his argument to take off the nonsuit. Neither case is apposite. In neither case was there any question as to the *existence* of the broker's contract. In Keys, the employment contract was discussed by the court only with respect to whether or not the broker was entitled to a commission when all or part of the consideration for the sale of the owner's land was an exchange for other land, rather than entirely cash. The existence of the broker's contract was not challenged.

Similarly, in Herman v. Stern, supra, a comprehensive lease agreement written in elaborate words of art provided for the payment of the broker's commission upon sale of the premises during the term of the lease. The lease was expressly ratified and approved by the owner and included a clause authorizing the broker to collect rents, which authorization was expressly referred to as an "authority coupled with an interest" in the broker. In that case, the court, at page 282, held that such provisions in a lease agreement to which an agent is not a party but which he may sign as agent for an owner, do not impose upon the landlord any obligation to pay a sales commission unless the owner specifically agreed to pay the same. In Herman, however, the court held that the owner's unequivocal ratification of the lease obligated him in clear and unambiguous language, for a recited consideration, to pay a specific commission. Such is not the case here.

It is readily seen that rather than supporting plaintiff's position, Herman militates against it. Plaintiff was not a party to the lease agreement we are considering, nor did it even sign the agreement as agent. Mary Mellus, revealed by Mr. Lykon to have been associated with plaintiff, merely signed as a witness to the tenants'—or perhaps all—signatures. As noted in Herman, the provisions in that lease having to do with the realtor's commission—although spelled out in clear and unambiguous language—were not binding upon the landlord until it specifically ratified and approved the lease in all particulars *after* the realtor had executed the lease as agent for the landlord. Until that ratification, the court said, the operable provisions of the lease were between tenant and landlord only. The clause relating to commissions merely constituted the realtor's offer until ratified.

The words relating to commission, here relied upon, are in themselves, or when considered along with the tenant's so-called "option," too vague and indefinite to constitute an offer of any sort. The defendants' signing of the lease, presumably prepared by the agent, therefore cannot be construed as their acceptance of an offer nor the creation of the separate agency contract urged upon us by plaintiff.

We conclude, as did the court at trial, that the plaintiff has failed to establish the existence of any contract under which it may be entitled to commissions in the circumstances of this case.

## ORDER

And now, June 23, 1970, plaintiff's motion to take off the nonsuit is denied and dismissed.