# Hill v. Pennsylvania Hospital

*S. Gerald Litvin,* for plaintiff.
*Jan E. DuBois,* of *White and Williams,* for defendant.

McDEVITT, *J.,* October 29, 1974—This medical malpractice case was tried before Hon. John J. McDevitt, 3rd, and a jury from January 7 to 15, 1974. At the conclusion of trial, the jury returned a verdict in favor of plaintiff, Floyd Hill, in the amount of $200,000. Defendant, Pennsylvania Hospital, thereafter filed timely motions for a judgment n.o.v. or for a new trial.

### I. FACTS
On May 27, 1968, plaintiff suffered an epileptic seizure and was taken to the emergency room of

defendant hospital by his friend, Ida Hayes. Upon his arrival, Mr. Hill was examined by an intern, Dr. William Lipschutz, who ordered that he be given intra-muscular injections of dilantin and phenobarbital. A male nurse, subsequently identified as David Waldron, proceeded to administer the injection into Mr. Hill's right arm. Immediately after insertion of the needle, Mr. Hill felt excruciating pain in the area of the injection and a sensation like "electricity" which radiated down his right arm and into his right leg.

Before Mr. Hill left the hospital on May 27, 1968, he noticed that his right wrist had begun to feel weak and started to droop. Just four days later on May 31st, Mr. Hill returned to defendant hospital, where his condition was diagnosed as a "right radial palsy," characterized by a wrist droop and severe weakness of the right hand. Plaintiff's expert, Dr. William Erdman, concluded that Mr. Hill had sustained permanent damage to his radial nerve as a result of the injection at Pennsylvania Hospital. This condition has left him unable to use his right hand for heavy lifting and prevents him from performing such routine functions as buttoning his shirt. Due to his lack of any formal education and his inability to read or write, the injury has left him virtually unemployable, since he is no longer able to perform the heavy labor required by his previous type of employment. Now 47 years of age, Mr. Hill has been unable to obtain employment since the time of the injection, in contrast to his previous record as an eight-year employe of a chemical firm.

In support of his allegation that nurse Waldron had been negligent, plaintiff indicated that he had received the injection in the area below the middle of his upper arm. There was also uncontradicted

testimony that the safe and proper place for an injection, in order to avoid nerve injury, is in the deltoid muscle or, roughly, the upper half of the arm. Mr. Waldron testified that he had no recollection of the incident, but stated that it was always his practice to administer injections in the deltoid area, in conformity with standard medical procedure.

## II. MOTION FOR JUDGMENT N.O.V.

In arguing for a judgment n.o.v., defendant maintains that plaintiff failed to meet his burden of proving that defendant's agent, David Waldron, had been negligent in administering the injection at issue, or that any such negligence was the proximate cause of plaintiff's injuries. It is, of course, axiomatic that in disposing of a motion for a judgment n.o.v., the evidence and all reasonable inferences arising therefrom must be viewed in a light most favorable to the verdict winner: Fallon v. Penn Central Transportation Co., 444 Pa. 148 (1971); Isaac v. Continental Casualty Co., 442 Pa. 480 (1971); Wisniewski v. Great A. & P. Tea Co., 226 Pa. Superior Ct. 574 (1974). As recently stated in Eldridge v. Melcher, 226 Pa. Superior Ct. 381, 385-86 (1973):

". . . A judgment n.o.v. is the directing of a verdict in favor of the losing party, despite a verdict to the contrary. It may only be entered in a clear case where the evidence is insufficient to sustain a verdict against him. Stewart v. Chernicky, 439 Pa. 43, 266 A. 2d 259 (1970). Judgment n.o.v. is inappropriate if the evidence on a material point presented an issue of fact for decision by the jury. This method of attacking the verdict may never be utilized so as to invade the province of the jury, especially where

that determination is based partly on questions of conflicting testimony and credibility of witnesses. Brandon v. Peoples Natural Gas Co., 417 Pa. 128, 207 A. 2d 843 (1965); Axilbund v. McAllister, 407 Pa. 46, 180 A. 2d 244 (1962). Where such questions were determined by the trier of fact, and if there is reasonable support for the verdict which was rendered, a judgment n.o.v. will not be granted."

Applying this test, we hold that there was ample evidence from which the jury could make a finding for plaintiff. The question of defendant's liability turned on whether the nurse who gave the injection failed to possess or employ the care and skill required of nurses for the time and place in question, or the nurse failed to exercise the care and judgment of a reasonable man in like circumstances: Incollingo v. Ewing, 444 Pa. 263, 274-75 (1971); Donaldson v. Maffucci, 397 Pa. 548 (1959). Both plaintiff's expert, Dr. William Erdman, and nurse Waldron himself agreed at trial that an intramuscular injection into the arm must be given above the midpoint of a person's upper arm, preferably in the deltoid muscle or as close as possible to the shoulder. As stated by Dr. Erdman: "The higher one stays without getting into the joint of the shoulder is safer to do the injection."

Defendant now makes the assertion that "[t]he only testimony regarding the site of the injection in plaintiff's case establishes that it was given no lower than the midpoint of the upper arm." This statement is incorrect, as indicated by the following excerpt from plaintiff's testimony:

"Q. Would you show us, please, about where in your right arm you got the needle?
"A. Just about along in there.

"Q. Do you remember the exact spot?

"A. No, not exact spot, but right along in that area here.

"Q. Let the record show he is indicating his right arm, Your Honor.

Do you know where on the right arm? You demonstrated, Mr. Hill, but do you remember whether it was the top of the shoulder or down near your elbow or about the middle or where?

"A. No, just about along in here.

"Q. Well, he is indicating somewhere in the middle of his upper arm, I would think.

"THE COURT: *He has a very large hand. It's probably down closer to the elbow, but he says he can't say specifically.*" (Emphasis added.)

Even defense counsel agreed that plaintiff had pointed to the lower half of the upper arm. In raising an objection to a question asked of plaintiff's expert, defense counsel made the following reference to Hill's testimony:

"MR. DuBOIS: Well, Your Honor, my objection is based on the characterization of the location of the injection, because when Mr. Hill pointed it out that's the only evidence on the record. *He had his whole hand on his arm just above the elbow,* and you made note of that.

"THE COURT: I made note he had a very large hand.

"MR. DuBOIS: *It was just above the elbow.* Mr. Litvin characterized it just above the middle of the upper arm.

"THE COURT: The jury saw where he placed his hand. If you like, we can have him come up and demonstrate again. It was the right arm toward the jury and they saw what he did." (Emphasis added.)

Mr. Hill's indication of the injection area represented a crucial piece of evidence and certainly raised a factual question which only the jury could resolve. In its charge, the court made clear that the jurors alone could resolve the issue of the injection site:

"You heard considerable testimony both on direct examination questions by Mr. Litvin and cross-examination by Mr. DuBois as to just what occurred in Pennsylvania Hospital, and particularly with respect to where the injection was given by Nurse Waldron. Now, there is some contradiction there. When I say contradiction, there is a direct contradiction there and that involves one of the decisions that you are going to make, and that is with respect to who do you believe. It would seem to me, although this is for you, of course, a direct disagreement between Mr. Hill and Mrs. Hayes and Mr. Waldron as to where this needle was injected . . ."

The jury subsequently made their determination, and we see no basis for now disturbing that decision.

In arguing that plaintiff failed to meet its burden of proof, defendant also contends that plaintiff's expert, Dr. William Erdman, merely inferred lack of due care on Waldron's part from the fact that Hill suffered a bad result. We disagree. Only after employing highly sophisticated electrical studies did the doctor determine that plaintiff's radial nerve was located at the same spot as in a normal person.[1] These tests also revealed that the damage

1. Among his many qualifications, Dr. Erdman is Medical Director for the Hospital of the University of Pennsylvania, and is chairman of the Department of Physical Medicine and Rehabilitation at the University of Pennsylvania School of Medicine.

to the nerve occurred in an area approximately four and seven-eighth inches above the elbow, or below the midpoint of the upper arm which measured 12 inches long. The doctor was presented with a lengthy hypothetical question which included the statement that plaintiff complained of a sharp sensation similar to an electric shock immediately after the injection. On the basis of this data, Dr. Erdman stated that Mr. Hill had sustained "a partial radial nerve paralysis secondary to injection of dilantin and phenobarbital." He also concluded that the injection which caused this condition was not given in conformity with "prevailing customary acceptable medical practice in the community." Such testimony from a duly qualified medical expert, in response to a comprehensive hypothetical question, conformed with all the applicable rules of evidence, and therefore cannot be viewed as ground for overturning the jury's determination.

### III. MOTION FOR A NEW TRIAL

Defendant's arguments in support of its motion for a new trial are as follows: (1) that the court allowed plaintiff to testify to hearsay statements regarding the availability of work for him; (2) that evidence as to salaries payable in the chemical industry should have been excluded because it was too speculative; (3) that the amount of the verdict was excessive; (4) that plaintiff's medical expert merely inferred lack of due care from the fact that plaintiff suffered a bad result; (5) that plaintiff's counsel improperly elicited opinion testimony from a doctor who had examined plaintiff at defendant's request; (6) that the court incorrectly instructed the jury that they could draw an adverse inference from defendant's failure to call this doctor who had examined plaintiff at defendant's request; (7) that

the court's charge ignored defendant's theory of the case; (8) that the court improperly took from the jury the alleged issue of "Saturday Night Palsy;" and (9) that the court improperly took from the jury the alleged issue of defendant's epilepsy.

A. *Alleged Hearsay Testimony.*

Defendant first charges error on the basis of three alleged hearsay references during plaintiff's testimony. The statements at issue are:

"Q. And when you went back to work, or tried to go back to work, and you told us you showed him the condition of your hand, did he tell you — what did he tell you?

"A. He said he didn't have nothing for me to do, like that. No kind of work for me to do with my hand like that."

" . . .

"Q. Mr. Hill, tell the jury, please, where you remember going for a job or what things you did to try to get a job. What you remember.

"A. I can remember one place at 2100 block of Elwood Street, and that made these little small tin pipes like a pipe from your gas heater.

"Q. Pipes from the gas heater?

"A. Yes. He said he couldn't use me. I think the next place was a hot water tank, that's in the 2400 block of Elwood Street. He said also that he couldn't use me.

" . . .

"Q. Wherever D.P.A. sent you, or the state employment office sent you, did people ever talk to you and see if you could do the work?

"A. Yes, they said I didn't have no work I could do."

We find no reversible error in this exchange. The court here was dealing with an illiterate man who had grave difficulties in expressing himself. Mr. Hill's references to the rejections he received in his job hunt represented an attempt on his part to explain why he had been unable to obtain employment. It probably would have been the better practice for plaintiff's counsel to have simply asked plaintiff where he sought employment, followed by a second question as to whether he obtained a job as a result of his inquiries. Instead the two steps were combined into one through plaintiff's reference to the statements of the persons who saw him.

While perhaps representing a technical violation of the hearsay rule, we believe that no error was committed by permitting this expedited procedure. Given the intelligence level of the witness, the court had little choice but to countenance this kind of answer. Furthermore, the extra judicial statements at issue added nothing of substance to the case; defendant was not prejudiced thereby and they cannot serve as a basis for undoing the work of the jury.

An additional consideration is defense counsel's failure to raise a timely objection to the testimony now cited as error. No motion of any kind followed the disputed statement. Later, the following exchange took place:

"MR. DuBOIS: Well, I am going to object to any statement regarding what might have been said at places he went looking for work, Your Honor.

"THE COURT: Well, I think it's too restrictive, Mr. DuBois. There is a communication problem here which isn't the fault of either counsel or the plaintiff. The answers are not quite responsive.

Let's try to break it down to what he actually did and what happened."

Thereafter, defense counsel did not object to the alleged hearsay statements, nor make a motion to strike plaintiff's testimony. Defendant is therefore precluded from arguing the issue at this point.

B. *Evidence Relating to Wage Scale.*

Defendant complains that evidence presented by a union representative as to salaries payable in the chemical industry should have been excluded because it was too speculative. Plaintiff here presented a claim for loss of earning capacity, which, of course, had to be measured by the difference between his earning capacity following his injury and what he would have been capable of earning had he not been injured.

Aside from the five-year passage of time between injury and the date of trial, the determination of earning loss was complicated in this case by the fact that plaintiff's former employer, the Henry Bower Company, had abandoned its chemical business in the early part of 1969. Therefore, in order to apprise the jury as to the history of wages in the chemical industry from 1968 to 1973, plaintiff presented the testimony of an official of the union representing the largest number of employes in the chemical industry. This witness, Albert Plusch, of the United Steel Workers Union, had also handled negotiations for employes of the Bower Company during the period that plaintiff worked there. Plusch prepared an analysis of wage scales from 1968 to 1973 for 12 chemical companies in the Philadelphia area. Selected for study was the hourly wages of employes in positions identical or comparable to Mr. Hill's job at the Bower Company.

Such evidence complied with the standard laid down by the Supreme Court for this subject area. In Smail v. Flock, 407 Pa. 148, 154-55 (1962), the court stated:

". . . 'Where it is proved that damage has resulted from an injurious trespass and the only uncertainty is as to the exact amount thereof such uncertainty is not ordinarily ground for refusing to allow any damage at all if the evidence furnish a basis from which reasonable calculation can be made.'

"There can be no doubt that the evidence in this case as to the value of the decedent's services furnished a reliable basis from which a reasonable calculation could be made. Justice is not to be denied in any case because proof is difficult. The purpose of law is to apply legal principles to facts and not to tailor facts to legal principles. What is reasonable and fair to a mind open to conviction is relevant and proper in the ascertainment of earning power."

The court carefully cautioned the jury that Mr. Plusch's testimony was not determinative of the issue but was merely introduced as a guide or as some possible assistance to the jury if accepted in whole or in part by them:

"The area that you have to consider carefully is, first of all, whether if it had not been for this accident and Mr. Hill had been laid off whether he would have looked for a job and whether he would have been able to obtain a job; and if he did obtain a job what would he have made. Mr. Hill is illiterate. However, he testified that if you tell him what to do, or show him what to do, he can do it. Now, you are not bound by these figures as to what the wage rates were in other plants after the date of this accident.

It's only offered as a guide, and it is perhaps the best available evidence as to what the employment and wage situation was in this chemical area or chemical company area."

Plaintiff here presented the best evidence under the circumstances. There is no doubt that Plusch's testimony afforded the jury with a basis for ascertaining plaintiff's loss in earning capacity. Furthermore, defense counsel had ample opportunity to cross-examine the union representative and to make his argument to the jury as to the figures presented for the earnings of laborers in the chemical industry.

### C. *Amount of Verdict.*

Defendant claims that the verdict was "excessive" but offers no supporting argument, except for the earlier contention that the jury erroneously considered hearsay statements regarding the unavailability of work. For the reasons noted in our previous discussion of this argument, we find defendant's position unmeritorious. As to the size of the verdict, we find that an award of $200,000 for permanent disability can hardly be considered excessive when special damages alone amount to $136,280.

### D. *Testimony of Dr. Erdman.*

Defendant again contends that Dr. Erdman merely inferred lack of due care on nurse Waldron's part from the fact that Hill suffered a bad result. We disposed of this argument in our consideration of the motion for a judgment n.o.v., and therefore will rely on that earlier discussion in also rejecting defendant's position for purposes of the motion for a new trial.

E. *Testimony of Dr. Mancall.*

Over two years prior to trial, on July 6, 1971, plaintiff was examined at defendant's request by a neurologist, Dr. Elliott Mancall. A copy of Dr. Mancall's report on this examination was provided by defendant to plaintiff's counsel and was subsequently introduced at trial for a limited purpose without objection. This report, however, was never read to the jury, and was not made available to them at the time of their deliberation. The report largely supported plaintiff's theory of the case, providing in pertinent part as follows:

"The findings as noted are those of radial nerve palsy. On the basis of the history as presented today and as outlined in previously available records, it would appear that this palsy dates from an intramuscular injection given during the course of hospitalization in the Pennsylvania Hospital in May of 1968, that injection presumably injuring the radial nerve at the site of penetration of the needle itself. Although by his testimony, the sensory changes are less prominent now than had originally been the case, it would seem that there has been no significant improvement in motor function and one must conclude that in the right-handed individual, this deficit constitutes an important source of occupational disability. In view of the fact that three years have elapsed since onset, the deficit must be looked upon [as] permanent."

Plaintiff then subpoenaed Dr. Mancall to appear as his witness at trial, after which defendant filed a timely motion to quash. By order of the court on December 28, 1973, the motion was denied "without prejudice to Dr. Mancall or counsel to raise at trial appropriate and relevant questions as to the propriety of his proposed testimony."

Out of the presence of the jury, Dr. Mancall was questioned at trial as to his willingness to answer questions regarding his opinion. He declined to do so on the ground that he felt obligated to defense counsel because he had examined Mr. Hill at defense counsel's request. On the authority of Pennsylvania Company, etc. v. Philadelphia, 262 Pa. 439 (1918), the court ruled that the witness could not be compelled to render an opinion for plaintiff against his wishes. See also, Evans v. Otis Elevator, 403 Pa. 13, 27 (1961). Defendant, however, complains that Dr. Mancall was forced to answer questions in violation of the ruling. We find no merit in this contention. While an expert may not be required to state an opinion for an adverse party, it is clear that all witnesses, including experts, are obliged to testify as to facts within their knowledge. As stated in Pennsylvania Company v. Philadelphia, supra: "The process of the courts may always be invoked to require witnesses to appear and testify to any facts within their knowledge.": 262 Pa. at p. 441. Thus, the court ruled correctly in permitting plaintiff's counsel to question Dr. Mancall as to whether he had made a finding regarding the permanency of plaintiff's condition, whether or not there was any occupational disability, and the cause of Mr. Hill's injury. These questions, which required simple "yes" or "no" responses, in no way forced the witness to state his opinions. When plaintiff's counsel tried to go further and asked Dr. Mancall to reveal what he had reported to defense counsel, the court sustained defendant's objection.

Later, in testifying about his examination of plaintiff, Dr. Mancall was asked why he had made certain tests. This also was directed to a factual issue and did not transgress the bar against opinion

testimony. However, the court properly sustained objections to questions asking whether his findings indicated any occupational disability, whether alcohol was responsible for the abnormalities in the right arm, and whether plaintiff was suffering from a temporary or permanent condition. In this way, the court carefully preserved the difficult dichotomy between fact and opinion testimony. Admittedly, the distinction between these two types of testimony is often vague and ill-defined. As noted in Evans v. Otis Elevator, supra, at p. 27:

"'. . . the line of demarcation between matters of fact and of opinion is frequently so indistinct that the admissibility of the testimony is largely a matter of the trial court's discretion, and even if technical error has been made, there will be no reversal in the absence of prejudicial error.'"

Certainly no such error occurred here. In arguing to the contrary, defendant fails to realize that a question as to whether an expert has formed an opinion is far different from an inquiry into the substance of that opinion. The latter type of question was never permitted by the court and defendant, therefore, has no ground for complaint.

## F. *Failure of Defendant to Call Dr. Mancall.*

Defendant is also mistaken in charging error on the basis of the court's instruction that the jury could draw an inference adverse to defendant for failing to call Dr. Mancall as one of its witnesses. The court stated:

"There is evidence in this case that defendant arranged to have Mr. Hill examined by a neurologist, Dr. Elliot Mancall, and that Dr. Mancall did examine Mr. Hill at defendant's request on

July 6, 1971. There had also been evidence that Dr. Mancall submitted a report to defendant's counsel and that this report included Dr. Mancall's findings or opinions as to the cause of the injury, the permanency of the condition, and the nature of any occupational disability caused by the injury. Further, while plaintiff's counsel was only permitted to question Dr. Mancall as to the history which he obtained, the examination which he performed and the findings which he made upon examination, Dr. Mancall did testify that he would be available, upon reasonable notice, if called to testify by defendant. Since defendant did not call Dr. Mancall to testify as to the cause of the injury, the nature and extent of occupational disability, and the permanency of the condition and disability, you may infer from defendant's failure to call Dr. Mancall and question him about these subjects that if he had been called by defendant his testimony on these subjects would have been unfavorable to the defendant.

"Now, there is a rule of law on this which has been carefully discussed with counsel and a decision made by the Court, in part. This inference that I have referred to that if he had been called by defendant his testimony on these subjects would have been unfavorable to the defendant. In other words, an inference which you may draw or may not draw is a matter for you to decide. I am not telling you that you do; I am telling you that you may. Now, the inference is permitted only where the witness, Dr. Lipschutz in this instance, is peculiarly—

"MR. LITVIN: Excuse me, Your Honor. Your Honor indicated Dr. Lipschutz.

"THE COURT: I am sorry. Dr. Mancall. I am

reading one thing and trying to think of something else.

"The inference is permitted only where the witness in this instance, Dr. Mancall, is peculiarly within the reach and knowledge of only one of the parties. Both parties knew of Dr. Mancall's examination, and both parties knew what he said in his report. But the position of the Court is that he is peculiarly within reach of the defendant alone because he is his witness or he was his examining physician and would be allowed to determine whether or not he would testify for anyone other than for the defendant."

It is, of course, well established that the trier of fact may draw an inference adverse to a party who, without adequate explanation, fails to produce evidence which would properly be part of his case and which is under his control: Bentivoglio v. Ralston, 447 Pa. 24 (1972); Williams v. Philadelphia Trans. Co., 415 Pa. 370 (1964); Buff v. Fetterolf, 207 Pa. Superior Ct. 92 (1965). Defendant, however, contends that the general rule is inapplicable here because there was no showing that Dr. Mancall was "peculiarly within the reach of defendant alone." The facts indicate otherwise. As his reason for not rendering an opinion for plaintiff, Dr. Mancall referred to his loyalty to defendant and its counsel. Moreover, after expressing an unwillingness to testify on behalf of plaintiff, Dr. Mancall specifically stated that he was available and willing to testify on behalf of defendant. There can be little doubt that the doctor would have readily expressed his opinion if he had been called to do so by defense counsel. Under the circumstances, it seems quite evident that the witness was, for all practical purposes,

under defendant's exclusive control, thereby making applicable the general rule about failure to call a witness.

### G. *Defendant's Theory of the Case.*

It is next alleged that the court ignored defendant's theory of the case and the evidence in support thereof. We find this a ludicrous assertion. The court made numerous references to the testimony of nurse Waldron, the alleged tortfeasor, who denied that he would have given an injection in the area indicated by plaintiff:

"You heard considerable testimony both on direct examination questions by Mr. Litvin and cross-examination by Mr. Du Bois as to just what occurred in Pennsylvania Hospital, and particularly with respect to where the injection was given by Nurse Waldron. Now, there is some contradiction there. When I say contradiction, there is a direct contradiction there and that involves one of the decisions that you are going to have to make, and that is with respect to who do you believe. It would seem to me, although this is for you, of course, a direct disagreement between Mr. Hill and Mrs. Hayes and Mr. Waldron as to where this needle was injected. (N.T. 1054)

" . . .

"In a sense, members of the jury, you have the testimony of Mr. Hill, Mrs. Hayes, and Mr. Waldron either that an incident did occur, or according to Mr. Waldron nothing occurred, because if it had he would have remembered it. Furthermore, he gave the injection, according to his testimony, in a safe area.

" . . . I have already discussed the arguments or the positions of the plaintiff and the defendant with

respect to the interpretation you should place upon the nurse's testimony. Clearly Waldron states that he gave the injection in the proper place, and he has no recollection of any complaint about it."

The court also thoroughly reviewed the testimony of defendant's other witnesses, Dr. William Lipschutz and Dr. William K. Staas.

Defendant has failed to document its claim of prejudicial treatment, but merely relies on the bold statement that "the Court made no reference to defendant's position that the injection in question was given at the midpoint of the plaintiff's upper arm or higher (under plaintiff's evidence) whereas the only evidence of the place of the injury to the nerve, the testimony of Dr. William Erdman, established that the nerve injury occurred at or below the midpoint of the upper arm and probably somewhere between a point 4 and 7/8'' above the lateral condyle and the middle of the forearm."

### H. "Saturday Night Palsy."

Defense counsel propounded the theory that plaintiff's injury was a manifestation of "Saturday Night Palsy," so-called because it is frequently found among many users of alcohol. This condition involves a compression type of injury to the radial nerve in the area of the axilla or armpit which results from the drooping of the arm over the back of a chair or other hard object over a prolonged period of time.

At no point during the trial did defendant introduce any evidence to support the submission of this theory to the jury. To be sure, defense counsel did elicit testimony showing that plaintiff was a heavy drinker who was regarded by one source as a "chronic alcoholic." However, nothing was ever

produced to connect this apparent drinking problem with plaintiff's arm injury. Rather, objective medical testing established that the damage to Mr. Hill's radial nerve occurred below the midpoint of the upper arm and not under his armpit. Defendant had Mr. Hill examined by two physicians and neither of these experts could testify to a single fact which, if true, would support a diagnosis of "Saturday Night Palsy." A finding by the jury that Mr. Hill suffered a compression injury under his armpit would have been without support in the record. It is, of course, well established that a court should never submit to a jury a conjectured theory of negligence or causation. See, Wilson v. Nelson, 437 Pa. 254 (1969); Auerbach v. Philadelphia Transportation Company, 421 Pa. 594 (1966).

Accordingly, the court properly instructed the jury as follows:

"Now, one other matter, and again I want to handle this carefully. Mr. Hill has been called an alcoholic, a drunk, chronic alcoholic. There are many references to Saturday night palsy. The defendant had a right to question all the witnesses, including Dr. Staas, as to what is Saturday night palsy. But this is the instruction I give with respect to how you view or how you handle the testimony regardless of the source. It relates to Saturday night palsy, but more particularly to the effect of a compression type of injury to the radial nerve in the armpit area—the axilla area, I believe they call it. So this is Plaintiff's Supplemental Number 20: 'During the trial there were a number of questions asked regarding a Saturday night palsy and a number of questions regarding the possibility of a radial nerve palsy being caused by draping the back of the arm over a hard-back chair. There has not

been, however, any competent medical testimony presented which would give you members of the jury a basis for finding or concluding that Mr. Hill's radial nerve palsy was caused by any such event or incident. Accordingly, I instruct, under the evidence in this case, you may not make a finding that Mr. Hill's radial nerve palsy was a result of a Saturday night palsy or the pressure caused by his arm being draped over a hard-back chair.'"

For the reasons enunciated above, this charge was correct.

## I. *Evidence Relating to Epilepsy.*

Defendant also quarrels with the court's instruction that the jury should not consider evidence relating to epilepsy. During the trial it was established that plaintiff had suffered three seizures, two in 1968 and one in 1970 after the accident. There was, however, absolutely no testimony that this apparent epileptic condition in any way affected Mr. Hill's earning capacity or life expectancy. He also denied having had any seizures other than the three specifically enumerated.

Prior to the close of the evidence, one of the jurors asked whether "epileptics were sent to neurological clinics." Fearful that the testimony relating to epilepsy might create speculation, conjecture or unnecessary confusion, the court instructed the jury to disregard the evidence on this subject:

"Now, before I forget it, epilepsy is out of this case. It was mentioned in one of the arguments. Nobody suggests that epilepsy is directly or indirectly involved in any phase of this claim. The only part the epilepsy plays in it, as far as the testimony is concerned, is the epilepsy is what directed Mr.

Hill to Pennsylvania Hospital. And that is the only significance."

In responding to defendant's exception to this charge, the court stated:

"THE COURT: I think I was trying to get this out of their mind because Juror Number 7 seems to have some thought about epilepsy and we don't know what it is. But I believe it's out of the case because there is no testimony that it will affect his life expectancy or ability to work. He has had three seizures over these periods of years. All right, what is next?"

A finding adverse to plaintiff based on the epilepsy testimony would necessarily have been the result of pure speculation and therefore impermissible. Thus, the court properly withdrew this collateral subject from the jury's deliberations.

## IV. CONCLUSION

On the basis of the foregoing discussion, defendant's motions for a judgment n.o.v. or for a new trial are hereby denied.